United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

J.J.,

Plaintiff,

v.

FRANK BISIGNANO, et al.,

Defendants.

Case No. 25-cv-09018-JCS

**ORDER REVERSING DECISION OF COMMISSIONER AND REMANDING FOR AWARD OF BENEFITS**

## I. INTRODUCTION

On December 17, 2021, J.J.[1] applied for supplemental security income ("SSI") and disability benefits under Title II and XVI of the Social Security Act alleging a disability onset date of November 1, 2018, which was later amended to April 1, 2019. Administrative Record ("AR") 184-185, 341. The claim was denied initially and upon reconsideration, AR 228-238, 239-252, and David LaBarre, an administrative law judge ("ALJ"), held a hearing on August 26, 2024. AR 65-145. The ALJ issued an initial decision on September 11, 2024, and an amended decision on September 17, 2024, finding that J.J. was not disabled. AR 15-41, 42-64. On August 15, 2025, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making it the final decision of the Defendant Commissioner of the Social Security Administration ("Commissioner"). AR 1-6. Plaintiff timely sought review of the Commissioner's decision in this Court pursuant to 42 U.S.C. § 405(g).

The parties have filed briefs on the merits in accordance with the Federal Rules of Civil

[1] Because opinions by the Court are more widely available than other filings and this Order contains potentially sensitive medical information, this Order refers to Plaintiff using only his initials.

Procedure's Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g). In response to J.J.'s opening brief, dkt. no. 11 ("Plaintiff's Opening brief"), seeking reversal of the Commissioner's decision and asking the Court to remand the case for an award of benefits, the Commissioner conceded that "Plaintiff has made persuasive arguments regarding the ALJ's evaluation of [the opinions of Kimally Samuels, L.M.F.T., and Marla Lane-Parks, L.M.F.T]." Dkt. No. 15 ("Commissioner's Brief") at 1. The Commissioner therefore agreed to remand for further proceedings but argues that remand for award of benefits is improper. *Id.* J.J. argues in his Reply brief, dkt. no. 18 (Plaintiff's Reply") that no further proceedings are required and that the Court can and should order the Commissioner to award benefits under the credit-as-true rule.

For the reasons stated below, the Court reverses the decision of the Commissioner and remands the case for award of benefits.[2]

## II. REGULATORY FRAMEWORK FOR DETERMINING DISABILITY

### A. The Five-Step Framework

Disability insurance benefits are available under the Social Security Act (the "Act") when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if their physical or mental impairments are of such severity that they are not only unable to do their previous work but also "cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act. *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent

[2] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

steps." *Id.*

At step one, the ALJ considers whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i).[3] If the claimant is engaged in such activity, the ALJ determines that the claimant is not disabled, and the evaluation process stops. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ continues to step two. *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or combination of such impairments that meets the regulations' twelve-month durational requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step. *See id.*

At step three, the ALJ compares the medical severity of the claimant's impairments to a list of impairments that the Commissioner has determined are disabling ("Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If one or a combination of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis continues. *See id.*

At step four, the ALJ must assess the claimant's residual functional capacity ("RFC") and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The RFC is "the most [a claimant] can still do despite [the claimant's] limitations . . . based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. § 404.1545(a)(1). The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform their past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). "Past relevant work is work that [the claimant] [has] done within the past five years that was substantial gainful activity and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 404.1560(b)(1)(i). If the claimant is able to perform their past relevant work, then the ALJ finds that they are not disabled. If the claimant is unable to perform their past

[3]The Court cites the regulations applicable to disability insurance benefits applications because the parallel SSI regulations are virtually identical.

relevant work, then the ALJ proceeds to step five.

At step five, the Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite [the claimant's] identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)). If the Commissioner meets this burden, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(f). Conversely, the claimant is disabled and entitled to benefits if there are not a significant number of jobs available in the national economy that the claimant can perform. *Id.*

**B. Supplemental Regulations for Determining Mental Disability**

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process. *See generally* 20 C.F.R. § 404.1520a. First, the Commissioner must determine whether the claimant has a medically determinable mental impairments. 20 C.F.R. § 404.1520a(b)(1). Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to the following functional areas: 1) understand, remember, or apply information; 2) interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself. 20 C.F.R. §§ 404.1520a(b)(2), (c)(3). Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1. 20 C.F.R. § 404.1520a(d). If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the evaluation proceeds to step four of the general disability inquiry. *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria). *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00. Any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental

impairments—is sufficiently severe to render a claimant disabled if it also satisfies the general Paragraph B criteria, which requires that a claimant's mental disorder "result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." *Id*. at 12.00(A)(2)(b). A claimant has a "marked" limitation if the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d). A claimant with an "extreme" limitation is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(e).

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above. Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."). If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity. 20 C.F.R. § 404.1520a(d)(3). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . . " Social Security Ruling 96-8p, 1996 WL 374184, at *4.

**C. Factual Background**

J.J. is 26 years old. AR 594. He was conceived when his mother was raped and his mother felt "pushed" by her family to go through with the pregnancy at age 19. AR 614. J.J.'s mother surrendered him to foster care when he was 8 years old. *Id.* J.J.'s mother had a history of substance abuse and psychiatric hospitalizations. AR 614-615. Before entering the foster care system, J.J. was emotionally abused by his mother and stepfather for many years and witnessed domestic violence in their home. AR 753.

When J.J. was 13, he was placed in a residential treatment facility, Creative Alternatives,



United States District Court
Northern District of California

United States District Court
Northern District of California

after three foster placements that failed due to "his hyperactivity, impulsivity, aggression, and bullying behaviors." AR 638, 645. When J.J. was 15 years old he returned to foster care. AR 753.

At age 13, K. Benjamin Knipe, Psy.D., diagnosed J.J. with PTSD, reactive attachment disorder, and depressive disorder. AR 622. That same year, psychiatrist Cynthia Hunt, M.D., diagnosed J.J. with ADHD, PTSD and rule-out mood disorder. AR 670. When J.J. was 17, psychiatrist Karen Mu diagnosed him with generalized anxiety order with panic attacks and depression. AR 744. When J.J. was 20 years old, Alfeo Reminajes, M.D., diagnosed him with generalized anxiety disorder, unspecified depressive disorder, and PTSD. AR 788.

From December 2020 to June 2021, J.J. received therapy treatment from Mateus Porter, MA, LMFT, who had also treated J.J. from March 2016 to November 2017. AR 801. Porter opined:

> [J.J.] struggles with Other Specified Anxiety Disorder with some depressive features. [J.J.]'s anxiety and depressive symptoms have prevented [J.J.] from having success academically (when I first started to work with him at AFS) and occupationally (when I started to work with him in private practice). [J.J.] has struggled with organization, panic attacks, depressive/negative thoughts, issues transitioning, difficulty focusing, and relational issues due to [J.J.]'s mental health. There has been a great impact of functioning due to [J.J.]'s mental health concerns and this impact cannot be resolved without further treatment.

*Id.* The record also includes a summary of treatment notes from Porter, stating as follows:

> Individual sessions occurred on 12/22/2020, 02/17/2021, 02/24/2021, 03/03/2021, 03/17/2021, 03/24/2021, 03/31/2021, 04/14/2021, 04/28/2021, 05/05/2021, 05/12/2021, 05/26/2021, 06/02/2021, 06/16/2021, and 06/23/2021. (Breaks in treatment are due to conflicting schedules).
>
> On 12/22/2020, [J.J.] missed the original time of session, but was able to meet later. Shortly after the session it was communicated to this therapist that [J.J.] had a panic attack while on a walk with his dog and little sister. On 01/25/2021 [J.J.'s] adopted mother explained that [J.J.] received antidepression and antianxiety medication from his psychiatrist and has been improving while on them over the past month. She also shared that [J.J.] still struggles with going outside of his house. Ongoing sessions were accomplished virtually while [J.J.]l lived in a family friend's home ([J.J.'s] previous foster parent). Due to [J.J.'s] anxiety around discussing emotional regulation, relationships, work, and life goals, [J.J.] often engaged in other activities in his room (lack of focus) while having sessions with this therapist. [J.J.] described feeling anxious about working due to his

> recurring panic attacks (for example, the fear that he would have a panic attack while working). Towards the end of treatment, while [J.J.] was on medication and attending individual therapy sessions regularly, [J.J.] showed some improvement with leaving his home more often to socialize with friends and taking his dog for walks. [J.J.] wanted to "take a break from therapy" in June 2021 and solely take his medication although he still struggled with being outside for extended periods of time and for long distances, had trouble sleeping, still felt anxious most of the week, and continued to struggle with maintaining healthy relationships.

AR 884-85.

One month after J.J. told Porter that he wanted to "take a break" from therapy, he began seeing Kimally Samuels, LMFT, who was J.J.'s treating therapist from July 2021 to March 2022. AR 798. In his first session with her, J.J. "presented as extremely anxious" and he reported that he had been having panic attacks and stomach pain and was "unable to eat." AR 887. Samuels observed that J.J. suffered from "crippling anxiety and depression," noting that he "had a difficult time with everyday tasks such as being in public, going to school and going to work" and that he had "panic attacks which made it difficult for him to navigate society." AR 798. Her treatment notes describe J.J. as "struggling with very serious emotional and psychological difficulties that appear to be interfering with perceptions, judgment, thinking, communication and mood." AR 887. Samuels observed that J.J. was "showing severe difficulties in most areas of life (e.g., relationships, work and school life)." *Id.*

From ages 21 to 23 (August 2021 to January 2024), J.J. was treated by psychiatrist Melanie Watkins, M.D., who prescribed medications and also conducted individual therapy. AR 810. Dr. Watkins diagnosed J.J. with generalized anxiety disorder and prescribed Zoloft and Klonopin. AR 810. She opined that J.J. was unable to work full-time, and unable to live independently. *Id.* Dr. Watkins described the following limitations on J.J.'s ability to function:

> *Rigid and concrete thinking. Patient has difficulty hearing other perspectives or seeing "shades of gray".
>
> *Fear of flying, fear of driving alone distances greater than sixty miles, fear of having panic attacks and not being able to manage his symptoms. Anxiety when driving over bridges alone. With therapy and medication, this his has improved since last year, however, it is still an area in which he struggles.
>
> *Illogical beliefs such as thinking he needs multiple tattoos and/or a large, intimidating dog to protect him from others.

United States District Court
Northern District of California

> *intermittent adherence with his medications. Needs reminders and reassurance.
>
> *Difficulty with hygiene e.g. not brushing teeth regularly and fear of going to the dentist.
>
> *Difficulty with authority, especially male figures in leadership positions.
>
> *He often runs late for appointments and has difficulty staying on track with appointments e.g. receptionist will call with multiple reminders or email patient often to schedule. He is demonstrating that he has difficulty with executive functioning and maintaining a regular schedule.
>
> •Patient often attempts to break rules or get away with socially unacceptable behavior e.g. not paying at parking meters, trying to get a seat closer to stage instead of assigned seats. Doesn't think about consequences such as getting a parking ticket or being asked to leave the concert together. In addition, when these rules ARE enforced by others, he becomes indignant and angry. He feels that rules for others don't apply to him.
>
> *His thinking is often transactional. He focuses on what others can do for him or how he might benefit from interactions.
>
> *He doesn't meet criteria for narcissistic traits, it's more-so a consequence of the environment he grew up in. He makes choices based on surviving and his choices are rigid, not nuanced e.g. not wanting to meet people or spend time with them if they aren't providing a tangible resource.
>
> *He has difficulty with being challenged or "called out" for behavior. He becomes defensive and tries to rationalize what he has done versus being able to be introspective. This would be difficult in the workplace as he is less likely to be forthcoming about mistakes he has made or take the time to assess deficits in his knowledge or training and to advocate for himself accordingly.

*Id.*

Since March 2023, J.J. has been seeing therapist Marla Lane-Parks, LMFT, on a weekly basis. AR 838. Lane-Parks completed a Mental Impairment Questionnaire ("Questionnaire") in July 2024 and provided a treatment summary as well. AR 837-842, 859-862. In the Questionnaire, Lane-Parks lists J.J.'s diagnoses as other mixed anxiety disorders, panic disorder, and other recurrent depressive disorders. AR 838. She states that J.J.'s "autonomic nervous system (ANS) remains in a sympathetic state (fight or flight response) with a recurring dorsal vagal state (associate with immobilization and shutdown, linked to trauma and extreme stress). It is

challenging for client to remain in a state of ventral vagal state—socially engaged, productive functioning." *Id*.

In response to questions about J.J.'s functional limitations, Lane-Parks found that in the category "Interact with Others" J.J. has moderate limitations with respect to his ability to "[k]eep social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness"; in the category "Concentrate, Persist, or Maintain Pace," he has moderate limitations as to his ability to "[c]omplete tasks in a timely manner," marked limitations in his ability to "[w]ork at an appropriate and consistent pace" and to "[i]gnore or avoid distractions," and extreme limitations in his ability to "[s]ustain an ordinary routine and regular attendance at work" and to "[w]ork a full day without needing more than the allotted number or length of rest periods"; and in the category "Adapt or Manage Oneself" he has moderate limitations in his ability to "[r]espond to demands," marked limitations in his ability to "[a]dapt to changes" and extreme limitations in his ability to "[m]anage psychologically based symptoms." AR 840-841.[4] Lane-Parks opined that J.J. would be "offtask" more than 30% of an 8-hour work day and would be absent from work due to his impairments 3 days a month on average. AR 841-842.

At age 18, J.J. moved back in with his former foster mother, Ashley Busby, when his mental health seriously deteriorated, renting her garage. AR 478, 485. J.J. continues to live with Ms. Busby to date. AR 562. Ms. Busby completed two Third-Party Function Reports, in March 2022 (AR 478-486) and July 2024 (AR 542-543). In the 2022 report, Ms. Busby stated that J.J. has difficulty with memory, concentration and completing tasks, AR 483, that he "antagonizes" authority figures and peers and was fired from Champs due to conflicts with other employees, and that in the face of "minor stressors" he "shuts down for several hours." AR 484. In the "Remarks" section of the form, she wrote:

> [J.J.] has trouble leaving the house on his own: He doesn't shop for himself unless I am with him. His last attempt to work full time was

---

[4] The Mental Impairment Questionnaire completed by Lane-Parks defined "moderate limitation" as "ability to function is fair (performance would be expected to be precluded by 20% in an 8-hour day"; it defined "marked limitation" as "ability to function seriously limited (performance would be expected to be precluded by more than 20%);" and "extreme limitation" was defined as "inability to function." AR 840.

> at Fed Ex, but he left after a week due to his mental health symptoms. He had several panic attacks after the Fed Ex job attempt. He blacked out and vomited from his anxiety. He has a fear of leaving the house, is paranoid that people are out to get him and afraid of people harming him. He's afraid of the dark and has anxiety driving over the bridge. When I left for vacation, he stopped eating, was distressed and suicidal and couldn't stop pacing. His therapist told me I needed to come home-so I did.
>
> He is only able to work 8 hours a week at the dog kennel because they know about his anxiety and they make sure he is not the only staff person, and he is allowed to leave when he feels anxious. They also allow him to bring his dog with him to his work shifts which comforts him, and they accommodate him by giving him short 4 hour shifts.

AR 485.

In her July 2024 report, Ms. Busby stated in the "Remarks" section of the form:

> While [J.J.'s] symptoms have improved somewhat since March 2022, he still experiences very high anxiety. He is not able to be away from the house or at work for long periods of time. To accommodate his anxiety, he has reduced his world to be very small. He still does not travel due to his anxiety. One improvement is that he is now able to cross the Bay Bridge, but only if traffic reports show little to no traffic, as he would still have a panic attack if he were to get stuck on the bridge in traffic. He has turned around on Yerba Buena Island due to traffic on the bridge. He is unable to visit his stepfather who lives in Southern California and has not seen him in four years. He also cannot visit his half-sister who lives in Santa Rosa. I have offered to go with him and stay with him for the entire trip, but it is still too overwhelming for him to attempt to travel this far from home.
>
> I observe [J.J.'s] anxiety to go through phases. When he feels anxious, he has trouble eating. If he has a panic attack, he will throw up. He is hypervigilant and worries all the time. He asks me again and again if I will be OK if he is worried about me. He also has nightmares and has a very hard time sleeping. He often sleeps only four hours before waking up anxious and has a very erratic sleep schedule. [J.J.'s] concentration is very limited. He has low tolerance for paying attention. He starts chores but does not complete them. In my observation, he can focus for 15-20 minutes at a time before becoming distracted. He loves basketball and when we watch games together, he is not able to stay focused on the game.
>
> [J.J.] now does 5 hour shifts at his job at the dog training center, but he cannot handle more due to his anxiety. His boss wanted him to go to a training course, but he was not able to participate because it was too far away from the house. If [J.J.] tries to work too much, he becomes overwhelmed with anxiety and shuts down. I have observed him miss work, go in late to work, and frequently leave work early because he is feeling anxious. He also brings his dog to work as a support. His boss allows him this flexibility due to his mental health. She knows he may need to leave if he is feeling anxious, so she does not schedule him to be the only staff person on site. He is able to do this part-time job due to this flexibility, but I do not believe he could

> do a regular job even part-time. For instance, he wants to change jobs and recently started a trial period at a gym which is only one mile from our house. However, he has been experiencing increased anxiety because there are times he is the only staff person at the gym and he is afraid of having a panic attack.
>
> [J.J.] does not go to the dentist or doctor regularly due to his anxiety. He struggles with hygiene and does not brush his teeth regularly. I have tried to teach him to cook for years, but he is too anxious about it. He buys ready-made food when we don't eat meals together. [J.J.] needs more care than other people his age, which I believe is due to his past trauma and neglect.

AR 542.

In a December 2, 2024 statement submitted in connection with J.J.'s application, J.J. stated that he had been fired from his job at the gym after being told he was not fulfilling his job duties, including sweeping before he went home. AR 585. In his statement, J.J. said that he "would often leave [his] shifts early and not sweep at the end because [he] was feeling overwhelmed and anxious by the end of [his] shifts and felt [he] needed to get out of there as quickly as possible." *Id.* He stated further:

> [My supervisors] told me I didn't do enough to interact with colleagues during a big meeting that was held for staff at the gym. I told them I thought I was a gym attendant and not a waiter. Hope told me I had a childish mindset because I needed to be told what to do. Hope doesn't like me, and we don't get along.
>
> I suspect that they may have also seen on the tapes that I left the front desk when I was supposed to be on duty, as I would often go into a back room if I was feeling overwhelmed or overly tired due to my insomnia. They may have also found out that I let people use the facilities without paying on several occasions, and that I closed up the facilities several hours before my shift ended without permission if there were no renters scheduled.

*Id.*

### D. The ALJ's Decision

The ALJ concluded at Step One that J.J. did not engage in substantial gainful activity ("SGA") between his alleged disability onset date of April 1, 2019, and April 2024, when he started working at a gym; the ALJ presumed substantial gainful activity from April 2024 through the date of the hearing August 26, 2024. AR 21.[5] At Step Two, the ALJ found that J.J. had the

[5] As discussed above, J.J. was fired from this job on October 3, 2024, less than two months after his hearing, because he had argued with his supervisors and was not fulfilling his duties due to



United States District Court
Northern District of California

United States District Court
Northern District of California

following severe impairments: post-traumatic stress disorder; major depressive disorder; generalized anxiety disorder; and panic disorder. *Id*. At Step Three, the ALJ found that J.J.'s impairments failed to meet or equal the criteria for establishing a presumptively disabling impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 22.

Next, the ALJ found that J.J. had the following RFC:

> [Claimant can] perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can understand, remember and carry out simple routine, involving simple work-related decisions and occasional workplace changes. He can occasionally interact with coworkers when it does not involve teamwork; and can occasionally interact with the public, but only in superficial interactions, such as greeting customers or directing a customer to the location of the nearest restroom. He can have occasional interaction with supervisors. The claimant requires low stress work, meaning few changes, if any, in the day-to-day work setting and in the tools and/or work processes used to accomplish tasks. With regard to maintaining pace, the claimant is able to work in an environment where productivity is judged at the end of the day rather than the middle of the day. The individual may miss up to one day of work a month at times up to five times per year, but would not consistently miss one day every month.

AR 23-24. The ALJ acknowledged the functional limitations described by Dr. Watkins, AR 27, but did not explain why he did not include them in Plaintiff's RFC. The ALJ found the opinions of Kimally Samuels unpersuasive on the ground that there were "no treatment notes" in the record from Samuels, although elsewhere in his decision he referenced the summary of treatment notes Samuels submitted after the hearing. AR 26, 28. The ALJ further found that Samuels' opinions were "inconsistent with the medical records." AR 28.

The ALJ found the opinions of consultative examiner Tania Shertock, who conducted an examination of Plaintiff in June of 2022 to be persuasive. AR 29, 803-806. He also found persuasive the opinions of Ricardo Buitrago, a medical expert who testified at the administrative hearing. AR 29.

At Step Four, the ALJ determined J.J. was unable to perform his past relevant work of

---

anxiety. AR 585. Plaintiff contends Plaintiff's job at the gym was an unsuccessful work attempt because he worked less than six months and was fired due to his impairments. Plaintiff's Opening Brief at 4 n. 3. The Commissioner does not challenge this assertion in his responsive brief.

animal caretaker or information clerk. AR 32. At Step Five, the ALJ concluded that J.J. was not disabled because he could perform the requirements of the following occupations: cleaner, commercial institution (DOT 381.687-014), window cleaner (DOT 389.687-014), and laborer, stores (DOT 922.687-058). (20 C.F.R. §§ 404.1569, 404.1569a, 416.969, and 416.969a). AR 32-33.

## III. ISSUES FOR REVIEW

Because the Commissioner has conceded that the ALJ's evaluation of the record was flawed and therefore, that remand is warranted, the only issue before the Court is whether further proceedings are required or if, instead, the case should be remanded for award of benefits.

## IV. ANALYSIS

### A. Legal Standards

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3). When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are free of legal error and supported by "substantial evidence." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record. *Richardson v. Perales*, 402 U.S. 389, 401. (1971). "'Substantial evidence' means more than a mere scintilla," *id*., but "less than preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (internal citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

Although previously, the opinions of treating physicians were to be given "controlling weight," under current regulations, the Commissioner instead must consider all medical opinions

and "evaluate their persuasiveness" based on the following factors: 1) supportability; 2) consistency; 3) relationship with the claimant; 4) specialization; and 5) "other factors." 20 C.F.R. § 416.920c(a)-(c). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that "form[ed] the foundation of the [prior] treating source rule." Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853; see also *Woods v. Kijakazi*, 32 F.4th 785, 791-92 (9th Cir. 2022). The ALJ is required to explicitly address supportability and consistency in their decision. 20 C.F.R. § 404.1520c(b)(2). As with all other determinations made by the ALJ, the ALJ's persuasiveness explanation must be supported by substantial evidence. *See Woods*, 32 F.4th at 787.

"A district court may affirm, modify, or reverse a decision by the Commissioner 'with or without remanding the cause for a rehearing.'" *Garrison v. Colvin*, 759 F.3d at 1019 (quoting 42 U.S.C. § 405(g)) (emphasis omitted). "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). On the other hand, the court may remand for award of benefits under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no] outstanding issues that must be resolved before a disability determination can be made" and "further administrative proceedings would [not] be useful"; and (3) "on the record taken as a whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate case).

The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Garrison v. Colvin*, 759 F.3d at 1021. Likewise, "[w]here there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).

**B. Discussion**

The Commissioner does not dispute that the first requirement for applying the credit-as-true rule has been met, having conceded that the ALJ failed to provide legally sufficient reasons for rejecting medical opinions of Samuels and Lane-Parks. However, he contends the credit-as-true rule should not be applied because "multiple conflicts in the evidence create serious doubt that Plaintiff is disabled." Commissioner's Brief at 3. In particular, the Commissioner asserts that "the opinions of Tania Shertock, Ph.D., and Ricardo Buitrago, Psy.D., indicate that Plaintiff is not disabled." *Id.* at 3. The Commissioner further contends "[o]ther evidence in the record, such as Plaintiff's treatment evidence and reported activities, creates further doubt that Plaintiff was, in fact, disabled under the Social Security Act." *Id.* at 3. The Court finds the Commissioner's arguments unpersuasive.

As a preliminary matter, the Court notes that while J.J. asserts that application of the credit-as-true rule establishes that he is disabled both because he meets several listings and because the limitations supported by the record establish at step five that he is disabled, *see* Plaintiff's Opening Brief at 4, the Court need not address the former argument because it finds that the latter argument is correct. "The Ninth Circuit has consistently remanded for an award of benefits in cases where the [vocational expert] was posed a hypothetical that included the RFC that the plaintiff would possess if the improperly discredited opinions or testimony were taken as true." *Potter v. Colvin*, No. 14-cv-02562-JSC, 2015 WL 3992944, at *5 (N.D. Cal., June 30, 2015). Here, the vocational expert testified that missing one day of work per month more than five times per year or being off-task for ten percent or more of the workday would preclude all work. AR 143. Yet both limitations are supported by the opinions of J.J.'s treatment providers, as well as the responses of Ms. Busby in the Third-Party Function Reports she completed in 2022 and 2024.

First, Lane-Parks, who provided weekly therapy from the time J.J. was 22 years old, found that in the category "Concentrate, Persist, or Maintain Pace," J.J. has moderate limitations as to his ability to "[c]omplete tasks in a timely manner," marked limitations in his ability to "[w]ork at an appropriate and consistent pace" and to "[i]gnore or avoid distractions," and extreme limitations in

his ability to "[s]ustain an ordinary routine and regular attendance at work" and to "[w]ork a full day without needing more than the allotted number or length of rest periods." AR 840. She further opined that J.J. would miss more than three days a month due to his impairments and that he would be off-task more than 30% of the time in an eight-hour day. AR 841-842.

While the ALJ found the opinions of Lane-Parks unpersuasive as to her findings of marked and extreme limitations, the reasons he offered for this conclusion are not supported by substantial evidence. (Indeed, the Commissioner has conceded that the ALJ's consideration of her opinions was flawed.). AR 55. In particular, neither Dr. Shertock's opinions nor Dr. Buitrago's opinions (both cited by the ALJ to support his credibility finding as to Lane-Parks) provide substantial evidence that J.J. is not disabled, as discussed further below. Therefore, the opinions of these agency consultants are not sufficient to give rise to a conflict in the record sufficient to require further proceedings to resolve any essential factual question.

Nor is the ALJ's assertion that Lane-Park's opinions are "unsupported by any records" supported by substantial evidence. In fact, Lane-Parks' summary of treatment is in the record. AR 859-62. Furthermore, the opinions and observations of J.J.'s treatment providers are consistent with the opinions of Lane-Parks regarding J.J.'s functional limitations, including those related to his ability to remain on task during an 8-hour day and to maintain a regular work schedule. Therapist Kimally Samuels, who treated J.J. in 2021 and 2022, described J.J. as "struggling with very serious emotional and psychological difficulties that appear to be interfering with perceptions, judgment, thinking, communication and mood." AR 887. She further found that J.J. was "showing severe difficulties in most areas of life (e.g., relationships, work and school life)."[6]

[6] As noted above, the ALJ found Samuels' opinions unpersuasive on the grounds that there were no treatment notes in the record to support her opinions and because her opinions were inconsistent with the medical records. AR 28-29. In his opening brief, J.J. argued that the ALJ's credibility finding was not supported by substantial evidence and the Court agrees. First, as J.J. points out in his opening brief, a summary of treatment was submitted after the administrative hearing and the ALJ acknowledged that these notes were in the record. *See* AR 26. Second, the Court finds that Samuels' opinions are consistent with the opinions of J.J.'s other treatment providers. In any event, the Commissioner conceded in his responsive brief that "Plaintiff has made persuasive arguments regarding the ALJ's evaluation of" Samuels' opinions, Commissioner's Brief at 1, and made no arguments in his brief challenging Plaintiff's argument that the ALJ's rejection of Samuels' opinions is not supported by substantial evidence. Therefore, the Commissioner has waived any argument that the ALJ's findings as to Samuels are supported

*Id*. Similarly, J.J.'s previous therapist, Mateus Porter, observed that "[J.J.'s] anxiety and depressive symptoms have prevented [J.J.] from having success academically (when I first started to work with him at AFS) and occupationally (when I started to work with him in private practice)" and that "[t]here has been a great negative impact of functioning due to [J.J.'s] mental health." AR 815.[7]

Likewise, J.J.'s psychiatrist, Dr. Watkins, who saw J.J. regularly for approximately two and a half years, found that J.J. was unable to work full time because of numerous specific functional limitations, discussed above, including fear of having panic attacks, inability to manage his symptoms, difficulty with hygiene, intermittent adherence with his medications (needing reminders and reassurance), running late, difficulty staying on track with appointments, and difficulty with executive functioning and maintaining a regular schedule. AR 810. The ALJ made no credibility findings as to the opinions of Dr. Watkins and in his responsive brief, the Commissioner did not respond to Plaintiff's argument that Dr. Watkin's opinions are well-supported by the record. Thus, any challenges to the supportability of her opinions are waived.

As to the opinions of Dr. Shertock, the Court finds unpersuasive the assertion of the Commissioner that this evidence demonstrates a factual conflict raising serious doubts as to whether J.J. is disabled.[8] First of all, the Commissioner mischaracterizes Dr. Shertock's opinions

by substantial evidence.

[7] The ALJ mischaracterizes Porter's treatment summary regarding J.J.'s desire to "take a break" from therapy in June of 2021. AR 26, 885. According to the ALJ, Porter found in June 2021 that "J.J.'s condition had improved to the point that [J.J.] felt he could take a break from therapy; and that [J.J.] was doing well on his medication." AR 26. The ALJ further found that this presented a "direct conflict" with Samuels' notes stating that when J.J. first came to her for treatment, in July 2021, he presented as "extremely anxious" and told her the way he was living felt "like hell" and that he needed medication." *Id.* But Porter's treatment notes indicate that whatever J.J. may have believed about his need for therapy when he told Porter he wanted to "take a break[,]" Porter found that J.J. was still experiencing serious mental health symptoms. AR 885 (finding that at that time J.J. "still struggled with being outside for extended periods of time and for long distances, had trouble sleeping, still felt anxious most of the week, and continued to struggle with maintaining healthy relationships."). Although Plaintiff argued in his opening brief that Porter's opinions should have been credited, the Commissioner did not address Porter's opinions in his brief.

[8] In his brief, the Commissioner states that Plaintiff did not contest in his opening brief the ALJ's findings that the opinions of Drs. Shertock and Buitrago were persuasive and therefore that any challenges to those opinions is waived. Commissioner's Brief at 3. In fact, Plaintiff argued in his opening brief that the ALJ's reliance on the opinions or both doctors was improper because neither of their opinions were supported by substantial evidence. Plaintiff's Opening Brief at 11. Thus, it



United States District Court
Northern District of California

to the extent he says that they "indicate that Plaintiff is not disabled." Commissioner's Brief at 3. In fact, many of Dr. Shertock's opinions echo the findings of J.J.'s treatment providers with respect to his functional limitations. Dr. Shertock stated that Plaintiff's "ability to interact with the public, supervisors, and coworkers appears questionable," that he has "significant impairments" in social functioning and is he is "unable to relate in a consistently adequate manner." AR 805-806. She also opined that J.J. "has had periods of decompensation with exacerbation and increase of symptoms accompanied by loss of adaptive functioning manifested in difficulties in performing activities of daily living, maintaining social relationships and inability to maintain persistence, concentration and pace." AR 803. She found his insight and judgment to be limited and noted that J.J. "report[ed] being unable to adequately handle some responsibilities of daily living including hygiene and grooming, household duties, and keeping appointments in a timely and appropriate manner due to depression." AR 805 She also found moderate levels of impairment in all of the following areas: understand, remember, and carry out complex instructions, maintain attention and concentration for the duration of the evaluation, maintain adequate pace while completing tasks, withstand the stress of an eight-hour day, maintain adequate persistence while completing tasks, ability to endure the stress of the interview, ability to adapt to changes in routine work-related settings, ability to complete a normal workday or workweek without interruptions from the claimant's psychiatric condition. AR 805-806.

Furthermore, to the extent that Dr. Shertock found only moderate impairment in J.J.'s ability to complete a normal workweek without interruptions from his psychiatric condition and in his ability to complete tasks, AR 806, these conclusions are inconsistent with the findings in the narrative section of her report, as Plaintiff argued in his opening brief and the Commissioner did not dispute in his response. It is also significant that Dr. Shertock did not review (and apparently was not provided with) any medical records, relying entirely on J.J.'s self-report in a "one time-limited mental status evaluation." AR 803. Dr. Shertock herself cautioned that "[s]hould there be discrepancies or conflicts between today's evaluation and any past encounters with this claimant,

---

is the Commissioner who has waived any responses to Plaintiff's challenges to the ALJ's reliance on the opinions of Drs. Shertock and Buitrago.

it is recommended that the claimant's psychiatric diagnosis *and symptom severity* be verified through examination of medical records from past or present treatment providers." AR 805 (emphasis added). As discussed above, medical records from J.J.'s treatment providers reflect that his symptoms and limitations with respect to his ability to maintain persistence and pace in a work environment are more severe than was found by Dr. Shertock.

The Court also agrees with Plaintiff's assertion that Dr. Buitrago's opinions are not supported by substantial evidence and therefore do not present a conflict raising serious doubt as to Plaintiff's disability. Dr. Buitrago had treatment records for only a six-month period and missed thirty minutes of Plaintiff's testimony at the hearing because his telephone connection dropped out. AR 102-104. Dr. Buitrago discounted the medical source statements of J.J.'s providers because of "minimal" treatment records to back them up, AR 111, but treatment records were supplied after the administrative hearing and are part of the administrative record that was before the ALJ. Therefore, Dr. Buitrago's opinions are entirely unreliable.[9] Again, Plaintiff raised this issue in his brief and the Commissioner did not address it, thus waiving any challenges on this issue.

The Commissioner also attempts to demonstrate a conflict in the evidence sufficient to warrant further proceedings on the ground that in July 2021, J.J.'s therapist Kimally Samuels "repeatedly noted that Plaintiff presented with only 'moderate' symptoms and his mental and emotional functioning suggested only 'moderate' difficulties." Commissioner's Responsive Brief at 3 (citing AR 887-904). The Commissioner mischaracterizes Samuels' treatment notes, however. During this one-month period, Samuels saw J.J. five times and while she described some functional limitations as moderate, e.g., social interactions and ability to maintain relationships, she also stated that during this period J.J. was "struggling with very serious emotional and psychological difficulties" and was "showing severe difficulties in most areas of

---

[9] For example, Dr. Buitrago testified that J.J. started therapy in January 2023 after being "absent, apparently, for twelve months." AR 107. But the medical record reflects that in 2022 J.J. received therapy from both Samuels and Dr. Watkins, as discussed above. Indeed, Dr. Buitrago himself referred later in his testimony to "individual therapy notes from July of 2022 to January of 2023, six months of notes that he's seen every other week." *Id.*

life[,]" including work. AR 887-88. This evidence does not give rise to serious doubts that J.J. is disabled.

The Commissioner also points to a statement by Dr. Watkins that J.J.'s mental impairments improved with therapy and medication to suggest that there is a conflict in the record that casts doubt on whether J.J. is disabled. Commissioner's Brief at 3-4 (citing AR 810). The Commissioner appears to be relying on a statement cherry-picked from the long list of functional limitations cited by Dr. Watkins in support of her opinion that J.J. is "unable to work full-time" in which she states that J.J.'s fear of flying, driving long distances alone and having panic attacks had "improved since last year" with therapy and medication. AR 810. But Dr. Watkin's made clear that "this [was] still an area in which J.J. struggle[d]." *Id.* Furthermore, it is entirely clear from reading Dr. Watkins' letter as a whole that she was *not* opining that medication and therapy had reduced his functional limitations to the point that he could work a full-time job. Indeed, she reached exactly the opposite conclusion.

Next, the Commissioner argues that J.J.'s "ability to play video games with friends and edit videos and use software while administering a Tik-Tok channel with a large following also suggests that he is not disabled because he is able to interact with others, concentrate to accomplish tasks, and perform at least simple tasks." Commissioner's Brief at 4 (citing AR 94-95, 124-25). Yet nothing in this evidence contradicts the opinions of J.J.'s treatment providers that J.J. is unable to maintain regular attendance or stay on task for a full eight-hour day. And neither the ALJ (who repeatedly cited J.J.'s Tik-Tok following to support his finding that J.J. is not disabled) nor the Commissioner explains how the ability to make occasional videos in his room translates to the ability to work a full-time job. Given J.J.'s testimony that at the time of the hearing he had not posted for a year, that he had never received any money for his videos, and that he made his own schedule and didn't work on videos on days he was anxious and stressed, AR 124-127, J.J.'s activities on Tik-Tok do not create any serious doubt as to whether he is disabled.[10]

[10] Again, in his opening brief Plaintiff challenged the ALJ's reliance on J.J.'s online activities to support his finding of nondisability but the Commissioner did not address Plaintiff's arguments in his response.

United States District Court
Northern District of California

Finally, the Commissioner argues that further proceedings are required because "Plaintiff testified that he was able to maintain employment during his alleged period of disability, first at a dog training facility and then at a gym, for up to 23 hours per week." Commissioner's Responsive Brief at 4 (citing AR 72-75). Again, the Court is not persuaded. The evidence in the record is consistent that J.J. maintained his dog training job only with significant accommodations, including working limited hours, never being assigned to work alone so that he could leave when he needed to due to anxiety or other mental health symptoms, and being allowed to skip work entirely under those circumstances. Likewise, J.J. never worked full-time at the gym and was eventually fired due, at least in part, to the fact that he regularly left work early because of his anxiety, failing to complete his work assignments. The Commissioner does not explain how either of these jobs establishes that J.J. can remain on-task for an 8-hour day or maintain regular attendance at a full-time job and such a conclusion would not be supported by substantial evidence on the current record. Thus, J.J.'s work history does not give rise to any essential factual conflicts related to his ability to maintain sufficient persistence and pace to hold a full-time job.

In sum, the Court finds that it is "clear from the record that [J.J.] is entitled to benefits[,]" *Garrison v. Colvin*, 759 F.3d at 1019. Because there are no essential factual disputes that must be resolved related to disability, *Treichler v. Comm'r of Soc. Sec. Admin*., 775 F.3d at 1101, remand for further proceedings would only delay the award of benefits. Therefore, the Court finds that the credit-as-true rule applies and remands for award of benefits.

## V. CONCLUSION

For the reasons stated above, the Court reverses the decision of the Commissioner denying benefits and remands for the calculation and award of benefits.

**IT IS SO ORDERED.**

Dated: October 27, 2026

JOSEPH C. SPERO
United States Magistrate Judge